**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TYRRAL MCGLOTTEN,**<br>*Plaintiff,*<br><br><br>        **v.**<br><br>**OMNIMAX INTERNATIONAL, INC. et al.,**<br>*Defendants.* | <br><br><br><br>**CIVIL ACTION NO. 2:21-cv-3998-MMB** |

<u>**MEMORANDUM OF DECISION**</u>

BAYLSON, J.                                                                                    **February 22, 2023**

      This is a racial discrimination case brought by a black male shipping supervisor against his former employer, a manufacturer and shipper of construction materials and building products, as well as against his former plant manager, a white male.  Plaintiff alleges that he was discriminated against on account of his race during the ten-month period that he was employed and supervised by Defendants, ending with his voluntary resignation.  Significantly, Plaintiff alleges that:

      (1) He was not given proper training,

      (2) He was not given the same access to facilities as other supervisors,

      (3) Racism was acceptable at his workplace, which included a hanging toy monkey,

      (4) His office and belongings were vandalized,

      (5) He was the only black supervisor hired by Defendants,

      (6) Upper management refused to support his managerial decisions on account of his
           race, and

      (7) His comments and complaints about all the above were ignored.

Stemming from these allegations, Plaintiff brought a hostile work environment claim, a disparate treatment claim and a retaliation claim under Title VII of the Civil Rights Act of 1964, as well as identical state law claims under the Pennsylvania Human Relations Act.

Under federal civil rights law, a business may be found liable for compensatory damages for conduct that results in an employee's adverse work experience where the basis for that conduct is the employee's race.  Around 17 years ago, the Third Circuit noted Title VII's success in reducing "open[]" racial discrimination in the American workplace.[1]

Plaintiff asserts that Defendants upheld a "discriminatory culture" at the Bucks County, Pennsylvania facility where Plaintiff worked and "refused to . . . provide equal treatment" to Plaintiff based on his skin color.  See Plaintiff's Supplemental Brief in Further Response to Defendants' Motion for Summary Judgment at 1 ("Plf. Supp. Br.") (ECF 44).  But this discriminatory culture was not in the open—Plaintiff bases his case on "facially-neutral" events that present a "more sophisticated type of discrimination."  See 12/8/22 Tr. of Mot. for Summary Judgment Argument Hrg. at 22:4-6, 29:3-7 ("Hrg. Tr.") (ECF 42).  This case theory is necessarily permitted by the Third Circuit to support discrimination claims.[2]  "Title VII applies to both facially neutral mistreatment and overt ethnic discrimination."  Cardenas v. Massey, 269 F.3d 251, 261 (3d Cir. 2001) (internal quotations omitted).

Now, Defendants have filed this Motion for Summary Judgment to dismiss all of Plaintiff's claims.  Plaintiff needs only to present a genuine dispute of material fact for his case

---

[1] From the Third Circuit's oft-cited Aman v. Cort Furniture Rental Corp.: "Anti-discrimination laws and lawsuits have 'educated' would-be violators such that extreme manifestations of discrimination are thankfully rare. Though they still happen, the instances in which employers and employees openly use derogatory epithets to refer to fellow employees appear to be declining."  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996).

[2] "Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and 'a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled. . . .'"  Aman, 85 F.3d at 1082 (quoting Riordan v. Kempiners, 831 F.2d 690, 698 (7th Cir. 1987)).

to survive summary judgment, of which Plaintiff provides several possibilities in his briefing and at oral argument.  See Plf. Supp. Br. at 1-3.

Because genuine disputes of material fact exist for some of Plaintiff's claims when viewing all justifiable inferences in favor of the non-movant, the Court will grant in part and deny in part Defendants' Motion.

## I.      JURISDICTION

This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. 1331 (federal question jurisdiction), and over his state law claims under 28 U.S.C. 1367 (supplemental jurisdiction) as they arise from the same set of facts.

## II.      FACTS

The following is a fair account of the factual assertions at issue in this case, as taken from both parties' Statements of Fact and briefs as well as the deposition transcripts and discovery documents reviewed by the Court, as the Court finds that many of the parties' stated facts as presented were in dispute.

### A.   Plaintiff's Testimony as to Defendants' Discrimination

The Plaintiff in this case is Mr. Tyrall McGlotten, a black male hired in October 2018 to be a shipping supervisor at Defendants' Feasterville-Trevose plant located in Bucks County, Pennsylvania.  Defendants are Omnimax International, Inc. ("Omnimax") and McGlotten's plant manager, Erich Doberenz.  As the morning shipping supervisor, McGlotten was mainly tasked with daily inventory checks, routing workers for truck packing, managing payroll, and supervising truck routing.  He supervised around 20 workers, and as first shift supervisor he was

supposed to arrive at the plant early to open up for the rest of the first shift floor crew.

McGlotten worked in this position for Omnimax until he resigned in July 2019.[3]

 Things got off to a poor start shortly after McGlotten's hiring, with McGlotten failing to

have his key fob activated so that he could open the facility up in the mornings.  McGlotten

complained to Defendant Doberenz, but the key fob was not activated until January 2019, about

two and a half months later.  McGlotten testified that this resulted in him having to wait for floor

workers to arrive to let him into the facility.  McGlotten felt targeted because a white employee

got the same issue "resolved in two weeks when my issue lingered for almost three months."

 Around this time, McGlotten raised with a customer service manager that one of the

customer service employees had hung a toy monkey at her cubicle, with McGlotten explaining

that he found it offensive and wanted it taken down.  In his testimony, McGlotten characterized

the toy monkey as "hanging from a noose."  Omnimax's human resources manager investigated

and declined to order the toy monkey taken down.

 During this time, McGlotten also began to complain that he was not receiving proper

training to do his job, including training on how to use Omnimax's computer software.

McGlotten testified that he was "belittled" by colleagues for his failure to get up to speed on his

responsibilities, which he blamed on the lack of training that he had received compared to his

coworkers.  It was also around this time that McGlotten began communicating with a lawyer

about potential discrimination claims against Omnimax.

---

[3] It is clear from even Mr. McGlotten's own testimony that he was not the only black supervisor at the Feasterville plant—in fact, another black supervisor, Lorenzo Davis, was deposed for this case.  However, McGlotten remains steadfast that it is significant that McGlotten was hired as a permanent worker while Davis was hired only as a temp worker because the temp workers would be eventually "leaving" as part of their contract unlike McGlotten.  See 12/8/22 Transcript of Motion for Summary Judgment Argument, 31:1-25 (ECF 42).  Yet, McGlotten frequently refers to Mr. Davis' own alleged racial discrimination at the plant in support of his contentions.  For the purposes of this Motion, however, it is not for the Court to decide if this distinction is significant but to decide whether a reasonable juror would find that McGlotten experienced a hostile work environment.

On April 24th, 2019—about six months into McGlotten's employment at Omnimax—McGlotten notified human resources that he discovered a large crack in the windshield of his car while it was parked at the Omnimax facility.  Human resources' investigation of the incident was hampered by the fact that the facility's parking lot video camera was out, and no tape was available.  No one was reprimanded for the incident.

On May 6, 2019, McGlotten complained that Doberenz would not approve McGlotten's taking a few days off, despite allowing another supervisor to take those days off.  McGlotten's alerting Doberenz of the other supervisor's plans resulted in Doberenz forcing the other supervisor to come to work for those days as well—McGlotten then complained that the other supervisor began to be more menacing to him, and at one point "smelled" him at the facility entrance.  Throughout this time, McGlotten also complained to human resources that he and other minorities at the facility were being asked to do jobs outside of their responsibility compared to what was asked of Caucasian workers.  Also around this time, McGlotten's office door was blocked one day by a large, immoveable metal skid, which McGlotten believed was intentional; the skid was removed that day.  McGlotten testified that at times he feared for his safety.

McGlotten emphasized that the "culture" of the Omnimax facility was one that was "resistant to change," and that his subordinates felt like they did not have follow the rules.  In June 2019, McGlotten got into an argument on the shipping floor with a black floor worker, Kim James, which was caught on camera.  McGlotten testified that he wanted to address the floor worker's failure to adhere with overtime rules, to which the floor worker responded by yelling at McGlotten to get out of his face.  McGlotten went to Doberenz's office and demanded that the floor worker be fired.  Then, McGlotten returned to the shipping floor and continued arguing

with the floor worker; the argument got so heated that a fellow supervisor had to get between McGlotten and the floor worker.  After a review of the incident, no one was disciplined, despite McGlotten's recommendations, and McGlotten testified that after the incident his subordinates basically stopped listening to him.

Later on in June 2019, McGlotten discovered that someone had written in marker on his office window that, among other work-related needs and schedules for the shipping floor, the floor needed "a honest" supervisor, perceived as a dig at McGlotten given his handling of the shipping floor incident.  McGlotten's version of what happened during the shipping floor incident varies from the versions given by other employees in the subsequent reports and through deposition testimony, and also seems to be at odds with the camera footage that recorded the incident (testimony from Doberenz and McGlotten differed as to what had occurred on the shipping floor and how the video should have been interpreted).  After an investigation of the window incident, Doberenz discovered from reviewing the security cameras that the perpetrator was Kasheen Hunter, a black floor worker.  Doberenz spoke with Hunter about the incident but did not punish Hunter.

In July 2019, McGlotten complained to human resources that his disciplinary authority was being undermined by Doberenz, who would not approve McGlotten's recommendations to discipline several shipping floor employees for failing to adhere to overtime rules and cellphone-use rules.

McGlotten was later accused in a complaint by a floor worker of "snitching" and using the N-word in an altercation with the floor worker.  McGlotten claims that around this time he believed Omnimax was actively trying to get him fired or to force him to resign, based on rumors at the facility and "words in the wind."  See Plf. Resp. Ex. B, McGlotten Dep. at 178:17-22.

6

Specifically, McGlotten testified that he heard he was facing termination from "[o]ne of the workers that had an in with Erich [Doberenz]," but couldn't remember who it was.  Id. at 179:2-11.  McGlotten testified that nobody in management had communicated that he would be fired, just that the altercation was being investigated.  Id. at 179:23-180:11.

Finally, on July 26, 2019 McGlotten emailed to human resources his letter of resignation, saying that he was forced to resign due to "a racially discriminatory and hostile work environment" at the facility.  McGlotten continued by saying that management lined him up to fail "from the start" by denying him "requisite tools and backing from my supervisors to complete the job."  He stated that "no action was taken" on his "multiple complaints" and that he had to do "what is best for my health and well-being."  Before resigning, McGlotten had initiated a charge of discrimination to the EEOC on July 15, 2019.

In general, McGlotten testified that he felt intimidated by his subordinates, that he witnessed minorities doing 'grunt work' that white workers were not asked to do, and that subordinates would make racist remarks under their breath although he could not identify who any of these subordinates were or remember any specific incidents.  Specifically, McGlotten testified that no one ever called him the N-word or anything racially derogatory to his face.

### B.  Testimony of McGlotten's Coworker

In support of his claims, McGlotten relies heavily on the testimony of one of his former coworkers, Lorenzo Davis.  Davis, also a black male, was employed by Omnimax at the Feasterville-Trevose facility as a temp supervisor during McGlotten's tenure there.

McGlotten cites frequently to Davis' testimony to show that genuine disputes of material fact exist that, considering all the circumstances, Omnimax harbored a discriminatory environment and that McGlotten was constructively discharged.  Examples include Davis

testifying that Doberenz told him he wanted to "change the culture" of the workplace, that some floor workers would say racists words under their breath, and that Davis himself was subject to discrimination similar to that alleged by McGlotten in this case.  Davis testified that, following the shipping floor incident involving McGlotten and the black subordinate, he had heard a rumor that McGlotten was going to be fired.

Not all of what Davis testified to was favorable to McGlotten's case.  Davis also testified that McGlotten had one of the most stressful jobs at the plant, because of the number of subordinates under managements and the time commitment required.  He testified that McGlotten's subordinates generally thought that McGlotten "was inept" in his role as supervisor. Davis also testified that Doberenz was never racist in any way and was likely just too busy to get McGlotten the key fob.

### C.  <u>Facts Favorable to Defendant</u>

Depositions were also taken of Doberenz and Omnimax's human resources coordinator, Tony Pennington.  Doberenz testified that while McGlotten represented that he was the only black supervisor to have been hired by Omnimax, two other black supervisors were hired while McGlotten was working there, including Lorenzo Davis.  Doberenz also testified that McGlotten's relationship with his subordinates deteriorated because of McGlotten's inability to handle his responsibilities.  Pennington testified that his investigation of the toy monkey revealed that the employee who owned the monkey had received it from a relative and had brought the toy with her when she started working at the plant.  Pennington also testified that despite hiring McGlotten, he ended up disagreeing with McGlotten's management style.

Regarding the toy monkey, McGlotten testified that he would have been offended by the monkey regardless of its origin, saying that "the overall depiction of monkeys is offensive to me"

8

and that there was no reason to think the doll, which was hanging in the employee's cubicle, was racist.  See Plf. Resp. Ex. B, McGlotten Dep. at 154:7-16.  Lorenzo Davis also testified that the metal skid left in front of McGlotten's office door was probably dropped there to make room on the shipping floor.

### III.    PROCEDURAL HISTORY

McGlotten filed this lawsuit in federal court on September 7, 2021.  Defendants filed their Answer on November 22, 2021.  A pretrial conference was held on December 17, 2021, during which discovery and dispositive motions deadlines were set.  Defendants filed an Amended Answer on March 23, 2022.  Following discovery, Defendants filed this Motion for Summary Judgment on July 11, 2022.  Plaintiff filed a Response on July 24, 2022, and Defendants filed their Reply on August 1, 2022.  Argument was held on the Motion on December 8, 2022, after which the Court ordered supplemental briefing from the parties.

### IV.    LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.  Under Federal Rule of Civil Procedure 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Id. at 255.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it

believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule, [ ] set forth specific facts showing a genuine issue for trial."  Stell v. PMC Techs., Inc., No. 04-5739, 2006 WL 2540776, at *1 (E.D. Pa. Aug. 29, 2006) (Baylson, J.) (citing Fed. R. Civ. P. 56(e)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical dispute as so the material facts.").  Summary judgment is appropriate if the adverse party fails to rebut by making a factual showing "sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

V.     **DISCUSSION**

McGlotten brings the following federal claims against Omnimax only:

Count 1: Hostile Work Environment,

Count 2: Disparate Treatment – Discrimination,

Count 3: Retaliation.

And against both Omnimax and Erich Doberenz the same three claims but under the Pennsylvania Human Relations Act.

Under the federal Title VII of the Civil Rights Act of 1964, "[i]t shall be an unlawful employment practice for an employer to . . . discriminate against any individual with respect to

his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ." 42 U.S.C. § 2000e-2(a).

Similarly, under Pennsylvania Human Relations Act ("PHRA"), it "shall be an unlawful discriminatory practice . . . for any employer because of race . . . to otherwise discriminate" against an employee. 43 P.S. § 955(a). Pennsylvania interprets the PHRA in the same manner as its federal equivalent under Title VII. See Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079 1083-84 (3d Cir. 1995) ("The state Act is construed consistently with interpretations of Title VII") (citing Chmill v. City of Pittsburgh, 412 A.2d 860, 871 (Pa. 1980)). Therefore, the Court's Title VII analysis may equally apply to the state law claims. See White v. Gallagher Bassett Servs., 257 F.Supp.2d 804, 808 (E.D. Pa. 2003) (Rufe, J.) (applying Title VII analysis to PHRA claims).

### A.  Count 1:  Hostile Work Environment

Hostile work environment is recognized by the U.S. Supreme Court as a basis for a claim of employer discrimination. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-68 (1986). To establish a hostile work environment claim under federal law, the Third Circuit requires that the plaintiff show that (1) he suffered intentional discrimination because of race, (2) the discrimination was pervasive and regular, (3) the discrimination detrimentally affected him, (4) the discrimination would have detrimentally affected a reasonable person of the same protected class, and (5) there is a basis for vicarious liability. Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001) (citing Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996)); Castleberry v. STI Group, 863 F.3d 259, 264 (3d Cir. 2017) (the correct standard is severe or pervasive). For a claim of hostile work environment, "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Durham Life Ins. Co. v.

Evans, 166 F.3d 139, 149 (3d Cir. 1999).  "[T]he advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim.  Cardenas v. Massey, 269 F.3d 251, 262-63 (3d Cir. 2001).

McGlotten's argument in support of his hostile work environment claim is essentially that a list of incidents and transgressions occurred during his employment when viewed as a whole amount to harassment "so severe or pervasive that it altered the conditions of [the victim's] employment and created an abusive work environment" which forced him to resign.  Brown v. Kaz, Inc., 581 F.3d 175, 182 n.4 (3d Cir. 2009).  Defendants argue that no discriminatory intent can be found by looking at the incidents individually or as a whole and that McGlotten's contentions are supported only by hearsay and uncorroborated evidence.

McGlotten cites a number of facts to show pervasive and intentional conduct, which appear to be the factors from Cardenas.  The record supports inferences that conditions at the Feasterville facility were very poor for McGlotten; testimony from McGlotten and the other witnesses tell a story of long hours, complicated work and poor work ethic on behalf of McGlotten's direct reports, including plain insubordination in the case of the workplace altercations.  The record establishes that McGlotten's supervisors and colleagues believed he lacked good managerial skills, that he exhibited poor managerial sense, that his job included stressful hours and responsibilities, that Omnimax's workplace was replete with black workers and supervisors, and that perceptions of racism in the workplace were not openly derogatory about McGlotten.

12

Despite these "bad facts" for McGlotten, it is the Court's duty under Rule 56 to consider reasonable inferences that a jury may make from disputed facts to decide whether a reasonable jury could conclude that McGlotten has satisfied his burden of proof.  Defendants point to the generally stressful conditions at the plant that came out in testimony, and the Court acknowledges that "employees are not guaranteed stress-free environments."  Connors v. Chrysler Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998) ("[The] discrimination laws cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.") (internal citations omitted).  But "a court may not weigh the disputed evidence and decide which is more probative, when deciding a motion for summary judgment." Lawrence v. National Westminster Bank New Jersey, 98 F.3d 61, 67 (3d Cir.1996) (internal quotations omitted) (holding that the district court erred in ruling that a plaintiff had failed to offer any evidence to survive summary judgment on its discrimination claim where the district court had simply discounted plaintiff's admissible evidence as less probative than defendant's).

Here, McGlotten has presented evidence through his own deposition testimony, the deposition testimony of his colleagues and several emails that would allow a jury to find that McGlotten was subject to an abusive work environment that his superiors allowed to exist. McGlotten alleges this conduct was intentional and had race as a basis; he points to the fact that he was singled out among his colleagues for the treatment he experienced.

"'The Supreme Court has clarified that determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"  Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 335 (3d Cir. 2014) (quoting Doe 1 v. Lower Merion Sch. Dist., 689 F.Supp.2d 742, 755 (E.D. Pa. 2010) (Baylson, J.)).  The circumstantial evidence here, while drawing reasonable inferences in

favor of McGlotten, compels the Court to hold that genuine disputes of material fact still exist regarding whether Defendants intentionally discriminated against McGlotten on account of his race.  For instance, McGlotten testified that while it took months for him to receive a key fob despite bringing it to his superior's attention early on, it only took two weeks for a white colleague to receive a key fob when faced with the same problem.

The same goes for Defendants' argument against vicarious liability.  To be held vicariously liable for a hostile work environment claim, the conduct must have been committed within the scope of the worker's employment and the employer must have been negligent or reckless in its failure to train the employee or take remedial action.  See Bonenburger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997).  The fact that Doberenz took so long to give McGlotten a key fob viewed alongside his decisions regarding McGlotten's other complaints could allow a reasonable juror to conclude that true remedial action was not undertaken by McGlotten's superiors, or that such actions were infected by bias against him on the basis of his race.[4]

The Court emphasizes, as it explained above, that its duty at this stage is to discern whether a reasonable juror could find in favor of the non-movant.  "A nonmoving party in a motion for summary judgment has the burden to produce evidence supporting its case with respect to material facts of the case on which it has the burden of proof."  Blunt, 767 F.3d at 297. Simply put, McGlotten has marginally produced the requisite evidence to satisfy his burden for Count 1, and so Defendants' Motion as to Count 1 and its state law analog will be denied.

---

[4] This point is also why the claims against Doberenz survive summary judgment.  It is true that Davis testified that he couldn't imagine Doberenz being racist—while this might be persuasive in a trial setting, at this stage the Court cannot weigh this fact against testimony regarding the amount of time it took Doberenz to address McGlotten's complaints and his consistently siding against McGlotten on workplace issues.

B. **Count 2: Disparate Treatment**

An employer commits a disparate treatment violation under Title VII when "an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of [race]." White v. Gallagher Bassett Servs., 257 F.Supp.2d 804, 808 (E.D. Pa. 2003) (Rufe, J.).  Disparate treatment claims require application of the burden-shifting framework articulated by the U.S. Supreme Court in McDonell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973):  (1) Plaintiff must establish a prima facie case of discrimination, after which (2) the Defendant must show a legitimate, non-discriminatory reason for the employee's mistreatment, and finally (3) Plaintiff must prove by a preponderance of the evidence that that Defendant's legitimate reasons are not legitimate, but constitute a pretext for discrimination.  See Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

Whether McGlotten has been subject to disparate treatment at the workplace due to his race is both a fact and a legal question that requires factual evidence based on the law.  For this sort of claim based on circumstantial evidence and facially neutral statements or actions, those statements or actions must be found to "send a clear message and carry the distinct tone of racial motivations and implications seen as conveying the message that members of a particular race are disfavored."  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996).  The Court is not to take on the role of juror at this stage—this case is a close one, and "clear messages" are hard to come by.  But given what has been presented by the parties through discovery at this point, the Court finds that a reasonable juror could conclude that McGlotten was subject to disparate treatment based on his race, in large part given the nature of his "singled-out" experience.  The same facts referenced above for Count 1 create a genuine dispute of material fact as to Count 2, namely the contention that McGlotten was singled out and treated

differently than his coworkers to his own detriment.  While Defendants argue that McGlotten

was merely disliked by his colleagues for his occupational failures and ineptitude and that

Doberenz took a long time to provide a key fob because he was too busy, McGlotten

successfully cites facts that provide justifiable inferences a reasonable juror can make to find he

was treated differently than his white coworkers.

     For those reasons, the Court will deny Defendants' motion as to Count 2 and its state law

analog.

### C. <u>Count 3:  Retaliation</u>

     To establish a prima facie case of retaliation under Title VII, a plaintiff must show that

(1) he engaged in activity protected by Title VII, (2) the employer took an adverse employment

action against him, and (3) there was a causal connection between his participation in the

protected activity and the adverse employment action.  <u>Nelson v. Upsala College</u>, 51 F.3d 383,

386 (3d Cir. 1995).  If the employee can establish a prima facie case of retaliation, the court will

apply the rest of the burden-shifting approach from <u>McDonnel Douglas</u> to determine if the

defendant is liable for the retaliation claim under Title VII.  <u>Krouse v. Am. Sterilizer Co.</u>, 126

F.3d 494, 500-01 (3d Cir. 1997).  Because McGlotten resigned, he must establish that he suffered

a constructive discharge by showing that "the employer knowingly permitted conditions of

discrimination in employment so intolerable that a reasonable person subject to them would

resign." <u>Goss v. Exxon Office Sys. Co.</u>, 747 F.2d 885, 888 (3d Cir. 1984).  This claim can be

established by demonstrating "(1) an unusually suggestive temporal proximity between the

protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with

timing to establish a causal link," or, in the absence of proof, (3) "that from 'the evidence

gleaned from the entire record as a whole' the trier of fact should infer causation." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

### 1. Constructive Discharge

The first important issue of this claim is whether a reasonable juror could find that McGlotten was constructively discharged.  McGlotten needs more than just rumor to get himself there.  See Clarkson v. SEPTA, 700 Fed.Appx. 111, 115 (3d Cir. 2017) (non-precedential opinion) ("[S]poradic threats of termination, workplace gossip, and disparaging comments, do not rise to the level of a materially adverse employment action").

Plaintiff argues that the cracked windshield, the office blockage, the "a honest" writing on his office window, and lack of remedy by HR combine to show retaliation for his earlier complaints about discrimination in the workplace.  Defendants argue that Plaintiff's contentions regarding temporal proximity and pattern of conduct fall short because the record does not establish that Plaintiff's workplace was discriminatory or that what Plaintiff claims befell him during his time working for Defendant could be categorized as having a racial basis.

Ignoring the potentially inadmissible hearsay statements by McGlotten's colleague,[5] McGlotten has still produced sufficient evidence to create a genuine dispute of material fact that he was constructively discharged, and therefore that an adverse employment action occurred at his expense that could result in liability.  The Court adopts its reasoning from Count 1 in support of this finding—if a reasonable juror could draw an inference from the facts that McGlotten was subject to a hostile work environment on account of his race, it follows that the same juror could draw a similar inference that that hostile work environment drove McGlotten to leave.

---

[5] The Court does not need to address this issue at this time.  See supra, Part VD.

See Cardenas, 269 F.3d at 267 ("If [Plaintiff] convinces a jury that he was victimized by a hostile work environment created by [Defendants], it is certainly possible that the same jury would find that the hostile work environment was severe enough to have precipitated [Plaintiff]'s resignation, i.e., constructive discharge.").

### 2. Retaliatory Action

However, this conclusion does not complete the Court's analysis of the Count 3—a retaliation claim requires retaliatory action.  From the facts cited, the Court does not find that a reasonable juror could infer that Defendants retaliated against McGlotten.  McGlotten cites to the investigation that occurred following a floor worker's complaint that he used the N-word.  But McGlotten cannot cite to any time that Doberenz or one of his superiors communicated to him or indicated in some way that consequently he would be terminated.  McGlotten, instead, testified that he realized he was going to be fired from "words in the wind" and communications with an unidentified colleague who had an "in" with upper management.  This is clearly not enough to support a claim of retaliatory action.  See Dowling v. Citizens Bank, 295 Fed.Appx. 499, 503 (3d Cir. 2008) (evidence based on "rumors more than anything else" falls short of demonstrating discriminatory animus); Paradoa v. PHA, 610 Fed.Appx. 163, 166 (3d Cir.) (non-precedential opinion) ("Speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn") (quoting Adeniji v. Admin. For Child. Servs., 43 F.Supp.2d 407, 423 (S.D.N.Y. 1999)).

Defendants argue persuasively against McGlotten's reliance on some of the testimony of Lorenzo Davis, a colleague during McGlotten's tenure at Omnimax.  Of relevance is that Davis, also black, testified to the content of conversations he had with Doberenz, to rumors he had heard from coworkers and superiors at the plant regarding McGlotten's future at Omnimax, and

conversations that Davis had had with McGlotten himself, all of which McGlotten cited in support of his contention that his claims should survive Defendants' motion for summary judgment. Defendants argue that these facts come from inadmissible hearsay and should not be considered at this stage.

Inadmissible hearsay statements should not be considered for the purposes of summary judgment. See Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009) (refusing to consider hearsay statements for purposes of summary judgment); Greene v. Virgin Islands Water & Power Auth., 557 Fed.Appx. 189, 199 (3d Cir. 2014) (non-precedential opinion) (approving the trial court's treatment of testimony regarding gossip and rumors about Plaintiff's potential termination as inadmissible hearsay for summary judgment purposes).

At this stage, it is unnecessary to determine whether Davis' testimony constitutes inadmissible hearsay statements for concluding that Count 3 should be dismissed because even if it is admissible, the relevant testimony still does not support retaliatory action on behalf of Defendants. The specific testimony from McGlotten concerns Davis' opinion that upper management was planning to fire McGlotten based on a conversation that McGlotten had with Davis. See Plf. Resp. Ex. B., McGlotten Dep. at 239:2-240:21. McGlotten testified that Davis told him management was "looking at ways to get rid of" McGlotten. Id. McGlotten also testified that Davis had told him that Doberenz was trying to find ways to terminate McGlotten. Id. at 246:4-11. However, McGlotten does not cite to any testimony from Davis confirming what was said in this conversation regarding McGlotten's possible termination. See Plf. Supp. Br. at 3. In reviewing the rest of Davis' testimony, Davis does not testify to personal knowledge that Doberenz and upper management was planning to fire McGlotten, let alone corroborating

McGlotten's testimony.  As stated in the analysis above, rumor and conjecture about one's status at the workplace is not enough to show that an employer acted in retaliation.

Because it is not necessary to do so at this juncture, the Court will reserve for trial the issue of whether Davis' testimony constitutes inadmissible hearsay.

For these reasons, the Court will grant Defendants' Motion as to Count 3 and its state analog.

### D.  Claims Against Defendant Doberenz

McGlotten brings several state law claims against his former boss, Erich Doberenz.  The cause of action exposing Doberenz to liability is slightly different than that for Omnimax, since Title VII does not impose liability for employees in their personal capacity.  See Dici v. Com. Of Pa., 91 F.3d 542, 552 (3d Cir. 1996) (citing Sheridan v. E.I. DuPont de Nemours, 74 F.3d 1439 (3d Cir. 1996)).  Instead, McGlotten argues that Doberenz should be held liable under Section 955(e) of the PHRA which prohibits "any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice...." 43 Pa. Cons. Stat. Ann. § 955(e).

Looking at the facts regarding Doberenz's failures to present McGlotten with the key fob in conjunction with his consistently dismissing McGlotten's complaints, there is a genuine dispute of material fact as to whether Doberenz singled out McGlotten for discriminatory treatment based on his race, with the given that Doberenz is a proper defendant under § 955(e). See Dici, 91 F.3d at 553.

### VI.    CONCLUSION

Based on the reasoning above, the Court will grant Defendants' Motion as to Count 3 and its state law analog and deny the Motion as to Counts 1 and 2 and their state law analogs.  An appropriate order follows.